## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Trimark Hotel Corporation, a Texas corporation, | Case No. 21-cv-915 (KMM/DTS) |
| Plaintiff, | |
| v. | **ORDER** |
| International Union of Operating Engineers Local Union No. 70, | |
| Defendant. | |

This case involves a dispute over the outcome of an arbitration between an employer and a labor union acting on behalf of one of its union-member employees. Following a final hearing, the arbitrator found in favor of the union and issued an award for the employee. The parties' cross-motions for summary judgment are now pending before the Court. The employer, Plaintiff Trimark Hotel Corporation ("Trimark"), asks the Court to vacate the arbitrator's award. [Pl.'s Mot., ECF No. 16]. The union, Defendant International Union of Operating Engineers Local Union No. 70 ("the Union"), asks the Court to confirm it. [Def.'s Mot., ECF No. 21]. For the reasons discussed below, Trimark's motion is denied, the Union's motion is granted, and the arbitration award is confirmed.

## I.      Factual Background

Trimark owns and operates the Millennium Minneapolis Hotel ("the Hotel"). Trimark and the Union are both signatories to a collective bargaining agreement ("CBA") applicable to the events relevant to this litigation. [Douglas Decl. ¶ 5, Ex. D ("CBA"), ECF No. 19 & 19-1]. The Union is an unincorporated labor organization that represents a

bargaining unit of employees who work at the Hotel, including Engineers, Painters, Utility Workers, and Helpers.

Omar Naguib worked at the Hotel as an engineer and was a member of the Union's bargaining unit. Mr. Naguib worked on the Hotel's boilers and chillers, responded to service calls, monitored the swimming pool, and maintained kitchen equipment. He became the Lead Engineer in 2014 and continued in that role until the early part of 2020.

In the first few months of 2020, the COVID-19 pandemic began to spread across the United States, impacting nearly every aspect of daily life and business operations, including those of the Hotel. The Hotel implemented temporary layoffs beginning in March, but Mr. Naguib continued working until June 17, 2020. [ECF No. 7-1 at 13–14].[1] That day, Trimark notified Mr. Naguib that, effective June 18, 2020, the his position under the classification of Lead Engineer was being eliminated. [Douglas Decl., Ex. A]. Trimark's letter stated that although it did not consider its action to be a layoff under the terms of the CBA, it was voluntarily providing Mr. Naguib with one week's pay in light of the circumstances and hardship generally affecting its employees. [*Id.*]

Five days later, the Union submitted a grievance on behalf of Mr. Naguib. [*Id.*, Ex. B]. The Union alleged the following:

> **Contract Violation(s):** Article 5, Section 1; and any/all other Articles, past practices and policies that may apply.

> **Remedy Desired:** It is our position that Mr. Naguib has the highest seniority date in the unit and should be able to replace a Building Engineer with lesser seniority, as long as he holds the qualifications required to perform the position; and that Mr. Naguib be made whole in all respects.

---

[1] The Union attached a copy of the arbitration hearing transcript to its Counterclaim. [ECF No. 7-1].

[*Id.*] Trimark rejected the grievance, and the Union continued to pursue a remedy for Mr. Naguib using the procedures established by the CBA. On July 1, 2020, Trimark issued a final written statement reaffirming that it was entitled to eliminate the Lead Engineer position under the CBA, leaving Mr. Naguib without a job. [*Id.*, Ex. C].

Following Trimark's rejection of the grievance, the Union initiated arbitration. [CBA, Art. 4, § 3; Douglas Decl., Ex. E]. On July 10, 2020, the Federal Mediation and Conciliation Service ("FMCS") sent a notice with a panel of seven arbitrators from which the Union and Trimark were to select an arbitrator to hear and decide their dispute. [Douglas Decl., Ex. E]. Using a system of alternative strikes, the parties landed on Arthur McCoy as their arbitrator. The arbitrator held a hearing on October 20, 2020, and issued a written Opinion and Award on January 11, 2021. [*Id.*, Ex. H ("Arbitration Award") at 1–2].

The CBA provides that the arbitrator's responsibility "shall be to determine whether the Company[2] or the Union is failing to abide by the provisions of [the CBA]." [CBA, Art. 4, § 7]. In his written decision, the arbitrator acknowledged this limitation on his authority. [Arbitration Award at 2; *id.* at 14].

During the arbitration, each side submitted their own characterization of the issues. The arbitrator recounted these issue statements in his written decision:

The Union stated the issue to be decided as follows:

Whether the Employer[3] violated Article 5 of the labor agreement when it laid off the Grievant, Mr. Omar Naguib, on June 17, 2020, and then immediately recalled two junior employees from lay-off? If so, what remedy is appropriate? …

---

[2] The CBA refers to Trimark as the "Company."
[3] Throughout the arbitrator's decision, Trimark is referred to as the "Employer."

3

The Employer stated the issue to be decided this way:

> "When the Employer exercises its express right under the Agreement to eliminate a job classification, do the employees whose jobs have been eliminated have the right to exercise seniority to bump less senior employees in other classifications where there are no vacancies and whose classifications are not affected by the classification elimination?"

[Arbitration Award at 2–3]. However, the arbitrator concluded that neither party's articulation of the issue was entirely accurate. Specifically, the arbitrator explained:

> The Employer's statement of the issue is at best too narrow and simply misstates the scope of the arbitrator's responsibility in this case. The Union's statement of the issue would require the arbitrator to find a fact that actually did not occur, namely that the Grievant was laid off following the elimination of the lead engineer position.

[*Id.* at 14].

The arbitrator reviewed the terms of the CBA that he concluded were relevant to the dispute before him, discussed the interplay of those provisions, considered the evidence as he made findings of fact, and concluded that Trimark could not terminate Mr. Naguib's employment "simply because it exercised its management right to eliminate his position." [*Id.* at 14–16]. In reaching that conclusion, the arbitrator explained that although Article 14 of the CBA gave Trimark the unilateral authority to eliminate the Lead Engineer job classification, Article 14 also provides Trimark with the "right to direct its employees, including but not limited to: The right to hire, promote, demote, transfer, layoff, ***discharge and/or discipline for cause***. . . ." [*Id.* at 14–15 (emphasis in original)]. The arbitrator reasoned that Trimark "properly exercised its right to eliminate the Lead Engineer position[, but] the right to eliminate a position does not automatically permit the discharge of the bargaining unit member who held the Lead Engineer position." [*Id.* at 17].

4

Accordingly, the arbitrator ruled in favor of the Union and Mr. Naguib, instructed Trimark to return Mr. Naguib to work as soon as possible, and ordered full back pay for the period of wrongful termination. [*Id.* at 22]. Further, the arbitrator rejected Trimark's argument that it should be allowed to deduct from its back-pay obligations the money that Mr. Naguib "was able to secure during the period of his wrongful termination. . . ." [*Id.*] Trimark initiated this action under Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, to vacate the arbitrator's award, and the Union counterclaimed for confirmation of the award. [Compl., ECF No. 1; Ans. & Countercl., ECF No. 7].

## II.   Analysis

Trimark asks that the arbitration award be vacated because the arbitrator decided an issue that was not submitted, failed to apply the language of the CBA, failed to disclose information revealing his potential biases toward an employer, and issued an award that was punitive. The Union asks the Court to confirm the award, asserting that the issues raised by Trimark do not justify vacating the arbitrator's decision. As discussed below, the Court concludes that the arbitration award should be confirmed.

### A.  Legal Standard for Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the

outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Irvin v. Richardson*, 20 F.4th 1199 (8th Cir. 2021). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

**B.  Review of Labor Arbitration Awards**

Arbitrations are a common method for resolving disagreements between employers and employees under collective bargaining agreements and "courts play only a limited role when asked to review the decision of an arbitrator." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987). "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 596 (1960).

Under this deferential standard, "a labor arbitration award should be enforced 'so long as it draws its essence from the collective bargaining agreement.'" *Keebler Co. v. Milk Drivers and Dairy Emp. Union, Local No. 471*, 80 F.3d 284, 287 (8th Cir. 1996) (quoting *United Steelworkers*, 363 U.S. at 597). Courts may not vacate arbitration awards "merely because [their] construction of the agreement differs from the arbitrator's." *Alcan Packaging Co. v. Graphic Commc'n Conf., Int'l Brotherhood of Teamsters & Local Union No. 77-P*, 729 F.3d 839, 841 (8th Cir. 2013). Courts will affirm an arbitration award where the arbitrator is "even arguably construing or applying the contract and acting within the scope of his authority. . . ." *Misco*, 484 U.S. at 38. An arbitrator's award will be confirmed even where parties allege that it is based on factual errors or a flawed contractual interpretation. *Nat'l Elevator Bargaining Assoc. v. Int'l Union of Elevator Constructors*, 921 F.3d 761, 764 (8th Cir. 2019).

However, the deference afforded to arbitration decisions is not limitless. If "a court concludes that the arbitrator did not stay within the bounds of his authority, this principle of deference inevitably gives way … to the greater principle that an award not drawing its essence from the agreement is not entitled to judicial enforcement." *John Morrell & Co. v. Local Union 304A of United Food and Com. Workers, AFL-CIO*, 913 F.2d 544, 560 (8th Cir. 1990) (quoting *Centralab v. Local No. 816, Int'l Union of Elec. Workers*, 827 F.2d 1210, 1217 (8th Cir. 1987)). Nevertheless, in determining whether arbitrators exceeded their authority, the court construes collective bargaining agreements broadly and "resolves all doubts in favor of the arbitrator's authority." *Morrell*, 913 F.2d at 560.

### C. Exceeding Authority

Trimark argues that the arbitrator exceeded his authority in issuing the award for two main reasons. First, Trimark asserts that the arbitrator decided the case on an issue that was never submitted by the parties, thereby subjecting Trimark to "arbitration by ambush." Second, Trimark contends that the arbitrator disregarded express contract language to issue an award that comported with his own sense of fairness and equity. As a result, Trimark argues that the arbitrator's decision neither construed nor applied the CBA, and his award does not draw its essence from that agreement.

#### 1. Arbitration by Ambush

Trimark's "arbitration by ambush"[4] argument focuses on the fact that the parties did not ask the arbitrator to decide whether Mr. Naguib was discharged "for cause." Despite that fact, the arbitrator discussed whether Trimark had shown cause for terminating Mr. Naguib's employment during the course of his written award. Trimark argues that this is a basis to vacate the arbitrator's award because the arbitration presented narrow contract-interpretation issues. According to Trimark, the content of the hearing itself further demonstrated that the parties considered the dispute to turn on an interpretation of the contract rather than on the existence of cause for the termination. Therefore, Trimark contends, when the arbitrator decided that Trimark had not shown cause for Mr. Naguib's termination, the arbitrator exceeded his authority under the CBA and resolved an issue that was not before him.

---

[4] The creative term "arbitration by ambush" is a characterization of the arbitrator's decision at issue in *Morrell,* 913 F.2d at 560, a case discussed in more detail below.

For at least three reasons, the Court finds Trimark's arguments on this issue unpersuasive. First, although Trimark implies that it and the Union presented identical, narrow contract-interpretation issues to the arbitrator,[5] the undisputed evidence in the record reveals otherwise. In fact, the issue statements from each side were quite different. Trimark framed the question as whether it had the authority under the CBA to eliminate a job classification, and in the event it did, whether the CBA provided for "bumping rights." Viewed from the perspective of what Trimark hoped to achieve, one can certainly see why Trimark would frame the issue in this manner—indeed, the arbitrator agreed that the CBA gives Trimark the unilateral authority to eliminate a job classification, and the CBA does not specifically mention bumping rights in the context of that decision. Meanwhile, the Union's issue statement asserted that Trimark's decision was a layoff, which was followed by an improper choice to call-back less senior employees to replace Mr. Naguib. Again, framing the issue this way served the Union's purposes because the CBA provides certain protections for senior employees in the context of layoffs,[6] and Mr. Naguib was, at the time he was let go, the most senior bargaining unit member at the Hotel. In any event, to the extent Trimark suggests that the parties presented the same issue of pure contract interpretation to the arbitrator, its argument is belied by the record.

_____

[5] In its opening brief, Trimark states "Arbitrator McCoy was mutually presented with a contract interpretation case. The case was tired by both parties as a contract interpretation case. The parties framed the issues in their post-hearing briefs as a contract interpretation case." *See* Pl.'s Mem. at 15–16, ECF No. 18.

[6] Article 5, Section 1 of the CBA provides that "Bargaining Unit Seniority [which is the length of time an employee continuously serves in any job classification] shall apply in all competitive (bidding) situations, including . . . layoffs." [CBA at 9].

Second, the Court finds that the arbitrator was entitled to reframe the question before him based on his determination that neither side's issue statement accurately captured the nature of the dispute. "It is true that when *two parties submit* an issue to arbitration, it confers authority upon the arbitrator to decide *that* issue." *NFL Players Ass'n v. NFL*, 831 F.3d 985, 997 (8th Cir. 2016) (cleaned up). However, because Trimark and the Union did not agree on what the issue was, it was within the arbitrator's authority to reframe it as he did. *Id.* ("But the parties here did not stipulate to the issues for arbitration. The scope of the arbitrator's authority, therefore, was itself a question delegated to the arbitrator. . . . And an arbitrator's interpretation or scope of the issue submitted to him is entitled to the same deference accorded his interpretation of the collective bargaining agreement."). Indeed, in *NFL Players Ass'n*, the union argued that "the arbitrator exceeded his authority by altering the issues presented for decision," but the court found that the arbitrator properly reviewed the parties' divergent framing of the issues before him and interpreted the scope of the issue submitted. *Id.* at 997–98. The same is true of the arbitrator's decision in this case. *See also Int'l Chem. Workers Union v. Day & Zimmerman, Inc.*, 791 F.2d 366, 369 (5th Cir. 1986) (concluding that the arbitrator properly determined the issue submitted by the parties where the arbitrator "stated the issue within his interpretation of the scope of the contract").

Third, although Trimark suggests that the arbitrator in this case made the same mistake as the arbitrators in two cases that were vacated by the Eighth Circuit, those cases are readily distinguishable. First, Trimark suggests that this case "presents an identical issue to that considered"[7] in *Morrell*, 913 F.2d 544. The *Morrell* parties stipulated to an issue for the

---

[7] Pl.'s Mem. at 12–13.

arbitrator to decide—whether striking employees "were entitled to replace the workers hired during the strike because they were protected by the seniority provisions of their collective bargaining agreement," an issue referred to as "the recall issue." *Id.* at 559. The arbitrator found in favor of the union on the recall issue and ordered the previously striking employees reinstated. *Id.* However, the arbitrator also concluded he needed to interpret whether the contract barred sympathy strikes, an issue not squarely before him, and he concluded that it did not. *Id.* The arbitrator did so even though a jury in a related federal district court case had already reached the opposite conclusion, "expressly holding that the no-strike clause barred sympathy strikes." *Id.*

The employer sought to vacate the arbitration award and a district court granted the request, concluding that the arbitrator's decision exceeded the scope of his authority. *Id.* Affirming that decision, the *Morrell* court agreed with the district court's reasoning that it "would have been irrational for the employer to consent to arbitrate the meaning of the no-strike clause after obtaining a jury verdict in its favor. . . ." *Id.* at 560.

Other circumstances also suggested that the parties in *Morrell* had not submitted the issue of the legality of the strikes to the arbitrator. The parties had indicated at a preliminary hearing that "they did not want the arbitrator to address the legality of sympathy strikes"; the parties explained that the discussion of the sympathy strikes in their briefing was intended for background purposes only; the arbitrator's characterization of the issue he had to resolve did not suggest the legality of the strikes had been submitted for arbitration; the parties did not present any evidence regarding whether the contract's no-strike clause barred sympathy strikes; and the employer's framing of the issue suggested that it assumed the strike was in

breach of the parties' agreement, not that it wanted the arbitrator to resolve that issue. *Id.* at 560–61. All of these facts bolstered the court's conclusion that the arbitrator in that case exceeded the scope of his authority.

The situation here is quite different. Perhaps most importantly, in *Morrell*, "the arbitrator framed the issue before him in the terms agreed upon by the parties. . . ." 913 F.2d at 560. Here, Trimark and the Union did not present a stipulated issue to the arbitrator. This meant that the arbitrator had the authority to frame the issue so long as he was arguably acting within the scope of the issues submitted to him. Where the arbitration considered in *Morrell* had a preliminary hearing at which the parties indicated they did not want a specific issue decided, Trimark does not point the Court to any comparable, mutual disavowal of the arbitrator's consideration of whether it or the Union was failing to abide by the terms of the CBA. Given these important differences, *Morrell* provides scant support for Trimark's position that the arbitrator in this case "failed to stay 'within the areas marked out for his consideration.'" 913 F.2d at 560 (quoting *United Steelworkers*, 363 U.S. at 598).

Trimark's reliance on *Minn. Nurses Assoc. v. N. Mem. Health Care*, 822 F.3d 414 (8th Cir. 2016) is even less helpful than its reliance on *Morrell*. The arbitrator in *Minn. Nurses Assoc.* was presented with a dispute about whether a hospital employer was allowed under the collective bargaining agreement to deny a nurse's scheduling request. 822 F.3d at 416. A provision in the contract provided that sufficiently senior nurses were eligible to be scheduled so that they would not work weekends, except in situations where there was "needed nursing service." *Id.* The arbitrator concluded that the hospital had properly invoked the exception for the time in question regarding the nurse-grievant's scheduling

12

request. *Id.* at 417. However, the arbitrator went on to announce a rule that would govern future hypothetical scheduling disputes that could arise between sufficiently senior nurses and the hospital. *Id.* When the union sought to have the arbitration award vacated, the district court concluded that the arbitrator had decided an issue that was not before him and vacated the portion of the award regarding future scheduling disputes. *Id.* at 418. The appellate court affirmed because "the issue as framed by the arbitrator expressly sought only resolution of a single, past act of [the hospital]—denying [the employee's] request to be permanently granted a benefit she sought," but the arbitrator exceeded his authority by providing a remedy for "future, as-yet-ungrieved acts." *Id.* at 420.

The arbitrator's decision here does not involve a comparable rewriting of the CBA. Nothing in the record suggests that the arbitrator purported to resolve a dispute that was never before him. In finding that the arbitrator exceeded the scope of his authority, the *Minn. Nurses Assoc.* court looked to "the arbitrator's own unchallenged framing of [the parties'] submissions," and in light of that framing, the court concluded that the arbitrator strayed beyond his mandate. 822 F.3d at 419. By contrast, when the issues submitted by the parties in this case diverged and neither satisfied the arbitrator as accurately identifying the task before him, the arbitrator framed the issue as whether either side was failing to abide by the terms of the CBA, a question he then addressed by interpreting the contract. The Court is "obligated to afford the arbitrator's interpretation of the scope of the issues presented the same deference as his interpretation of the CBA." *Id.* Though this principle did not require the *Minn. Nurses Assoc.* court to confirm the arbitration award issued by a rogue arbitrator, it compels the Court in this case to conclude that the arbitrator did not exceed his authority.

Trimark was not subjected to arbitration by ambush.

### 2. Disregard of Contract Language

Trimark next argues that the arbitrator disregarded the CBA's plain language to issue an award that comported with his own sense of fairness and equity. Trimark points to several aspects of the arbitrator's decision to support its contention that the arbitrator essentially read into the contract a bumping-rights provision where none exists. [Pl.'s Mem. at 16–20]. The Court concludes that the arbitrator's award is based on the language of the CBA and does not rewrite the parties' agreement. Trimark's arguments to the contrary merely invite the Court to disagree with the arbitrator and interpret the CBA differently.

A summary of what the arbitrator actually decided demonstrates that his decision drew its essence from the CBA. As discussed above, the arbitrator was authorized to frame the question presented. He defined the issue by referencing a provision in the CBA which provides "[t]he sole function of the arbitrator shall be to determine whether the Company or the Union is failing to abide by the provisions of this Agreement, and the arbitrator shall not have any authority to change, modify, supplement, or otherwise alter in any respect whatsoever, this Agreement or any part thereof." [Arbitration Award at 2 (quoting CBA, Art. 4, § 7); *id.* at 14]. The arbitrator next looked to the language of Article 14, Section 1, Paragraph 11, which provides that Trimark has the authority to "establish or discontinue any and all operations, including the total cessation of business." [CBA at 19–20]. The arbitrator concluded that this language includes the right to eliminate any of the bargaining unit positions, and that Article 14 "further makes clear that the Employer's decision to eliminate the Lead Engineer position is not subject to the grievance procedures." [Arbitration Award

at 14].

However, the arbitrator found that another provision of the agreement was "important to address," namely Article 14, Section 2, "which states: 'The Company shall have the exclusive right to direct its employees, including but not limited to: The right to hire, promote, demote, transfer, layoff, ***discharge and/or discipline for cause***. . . .'" [*Id.* at 14–15 (quoting CBA, Art. 14, § 2) (emphasis in Arbitration Award)]. The arbitrator concluded that the CBA gave Trimark the right to eliminate the job classification of Lead Engineer, but interpreted that power in the agreement as distinct from Trimark's authority to terminate his employment. [*Id.* at 15]. Stated elsewhere, he read the contract to mean that "the right to eliminate a position does not automatically permit the discharge of the bargaining unit member who held the Lead Engineer position." [*Id.* at 17]. In light of the for-cause provision, the arbitrator concluded that Trimark's "right to terminate a member of the bargaining unit is not unlimited and is subject to scrutiny," and he found that the CBA did not include language that allowed Trimark to "terminate the Grievant simply because it exercised its management right to eliminate his position." [*Id.* at 16]. Further, he concluded "[t]here are no words in the contract that support the Employer's right to terminate the Grievant without demonstrating that it had just cause to do so." [*Id.*]

Having concluded that the CBA's terms required a showing of "just cause" to terminate employment even where Trimark had eliminated a job classification, the arbitrator went on to consider whether the evidence before him showed that there was a justifiable basis for terminating Mr. Naguib's employment based on his performance or conduct. [*Id.* at 16–18]. The arbitrator's analysis then turned to another inquiry into Trimark's authority to

recall two bargaining unit members who had been laid off and who had less seniority than Mr. Naguib. [*Id.* at 18]. The arbitrator found that the contract required consideration of Mr. Naguib's seniority under those circumstances and that the record established that Mr. Naguib was qualified to perform the duties of the Building Engineer position. [*Id.* at 18–19].

Finally, the arbitrator concluded that Trimark "violated the Agreement by discharging without cause the most senior engineer in the bargaining unit and recalling less senior bargaining unit members to do the work he had been performing," and that the evidence supported a finding that Mr. Naguib had the requisite skills to continue that work. [*Id.* at 19–21].

Trimark points out that the parties negotiated revisions to the CBA in 2019 and 2020, that the Union did not bargain for bumping rights during those negotiations, and that the language of Article 12, Section 1, allows Trimark to eliminate a job classification without any bumping rights. [Pl.'s Mem. at 18]. Trimark further contends that the arbitrator "turned the issue on its head and separated the unquestionable right of management to eliminate a job classification from the attendant termination of the incumbent's employment." [*Id.*]. Trimark suggests that the arbitrator's consideration of whether Mr. Naguib could be discharged for just cause was irrational and contrary to the express language of the CBA and Trimark's right to eliminate a job classification. [*Id.* at 18–19].

Far from demonstrating that the arbitrator's decision did not draw its essence from the agreement, these arguments invite the Court to interpret the CBA anew and to reach a different conclusion about what its terms mean. The Court cannot do so under the

applicable standard of review. What Trimark characterizes as a failure to apply clear or plain

contract language was in reality the arbitrator's recognition that the provisions of the

agreement Trimark relied upon to justify terminating Mr. Naguib's employment did not

expressly provide for such authority. The arbitrator's decision can either be characterized as

finding that the plain language did not authorize Trimark to take the action it did, or treating

the silence on the issue as an ambiguity, and reviewing the terms of the CBA to determine

whether the termination was otherwise authorized. Either way, the Court does not agree that

the arbitrator ignored the plain language of the agreement and "dispense[d] with his own

brand of industrial justice."[8] *United Steelworkers of Am.*, 363 U.S. at 597. Rather, the arbitrator

was interpreting the parties' agreement when he concluded that, in the absence of a showing

of just cause, Trimark could not terminate Mr. Naguib's employment simply because it

---

[8] The cases cited in Trimark's memorandum where courts concluded that arbitral awards
were not drawn from the essence of the collective bargaining agreement involve
circumstances that clearly indicated overreach. *See Champion Int'l Corp. v. United Paperworkers
Int'l Union, Local 507*, 168 F.3d 725, 730–31 (4th Cir. 1999) (vacating an arbitration award in
favor of 17 union employees where an employer policy would not have made those
employees eligible for certain bonuses, the CBA contained no mention of the bonuses, and
the arbitrator's decision indicated that "he drew on his own notions of fairness" in issuing
the award); *Mountaineer Gas Co.*, 76 F.3d 606, 609–10 (4th Cir. 1996) (affirming summary
judgment order vacating arbitration award where the arbitrator's decision revealed that
although the CBA and a management policy plainly authorized the employee's discharge
following a positive drug test, the arbitrator found the strict application of the policy unfair
and applied an exception to it that was found nowhere in the policy or the agreement);
*Detroit Coil Co. v. Int'l Ass'n of Machinist & Aerospace Workers, Lodge No. 82*, 594 F.2d 575, 581
(6th Cir. 1979) (reversing a district court's decision confirming an arbitration award where
the CBA required notice of the union's election to proceed with arbitration within 8 days of
the final step in the grievance procedure or else the grievance was considered resolved, the
union's letter concerning arbitration was untimely, and the arbitrator disregarded the CBA's
language, and the arbitrator relied on past practices and his belief that the relationship
between the union and the company could deteriorate if the grievance was not heard on the
merits).

exercised its management right to eliminate a job classification.

One remaining argument from Trimark regarding the arbitrator's supposed disregard of the CBA's language warrants discussion. Trimark argues that the arbitrator ignored express contract language by deciding an issue that was not properly joined through the grievance procedure. [Pl.'s Mem. at 17–18, 19]. Article 4, Section 6 of the CBA provides that "[o]nly matters which come within the specified definition of a grievance as set forth in Section 1 and which have been processed through the regular grievance procedure shall be considered." [CBA at 7]. Trimark contends that under this provision, the arbitrator had to limit his decision and discussion to a specific issue that was raised in the Union's grievance and that went through each stage of the contractual grievance procedure. [Pl.'s Mem. at 17–18, 19]. But Trimark overlooks the fact that in the original grievance, the Union alleged contractual violations of "Article 5, Section 1; and any/all other Articles, past practices and policies that may apply." [Douglas Decl., Ex. B]. As a result, the grievance suggested that *any* violation of the CBA's articles was in play, and the arbitrator appears to have agreed.

Indeed, in re-framing the issues presented by the parties, the arbitrator concluded that the task before him was to determine whether Trimark or the Union was "failing to abide by the provision of [the CBA]." [Arbitration Award at 14 (quoting CBA, Art. 4, § 7)]. The arbitrator acknowledged Trimark's argument that in its grievance the Union "adverts vaguely to Article 5 and any other article, but failed to show ... a violation of a specific provision of the agreement." [Arbitration Award at 9 (quoting Trimark's Post-Hr'g Br. at 12, found at Douglas Decl., Ex. I)]. Trimark further argued during the arbitration that any issue other than the bumping-rights contract-interpretation issue, which Trimark itself framed, had been

18

waived based on Article 4, Section 6 of the CBA. [Trimark's Post-Hr'g Br. at 11 n.13 ("[T]his arbitration decision must be limited to the sole issue presented in the grievance: whether the Hotel has the right to eliminate job classifications without a corresponding right of an employee to bump another classification based on seniority. Any other argument was waived under Article 4, Section 4.2 and 4.6 of the Agreement.")]. Given the arbitrator's broad re-framing of the issue before him, he clearly did not agree with Trimark's suggestion that Article 4, Section 6 of the CBA should be interpreted to support a finding of waiver of any other issue. And the arbitrator was "at least arguably acting within the scope of the issues submitted to him, so his decision must be upheld." *NFL Players Ass'n*, 831 F.3d at 997. Like other arguments addressed in this section, Trimark's suggestion that the arbitrator strayed beyond the essence of the agreement in deciding an issue that was not properly grieved is ultimately an impermissible attempt to have this Court disagree with the arbitrator's interpretation of the contract.

### D. Impartiality

Trimark next argues that the arbitrator "failed to disclose his own prior court decision in a wrongful termination case and operated with bias and impropriety." [Pl.'s Mem. at 20]. Although Trimark points to the arbitrator's "own prior court decision," it is really referring to a decade-old case in which the arbitrator was the plaintiff suing his former employer for wrongful discharge.[9] Trimark does not contend that the arbitrator was expressly required to disclose his involvement in that case under the applicable arbitrators' Code of Professional

---

[9] *McCoy v. Metro. State Univ.*, No. A11-225, 2011 WL 3903282 (Minn. App. Sept. 6, 2011).

Responsibility. Instead, Trimark argues that the arbitrator should have disclosed this information because it would reasonably present a concern about his impartiality and would have led Trimark to strike him from the list of candidates the parties were considering appointing to decide their dispute. Because the disclosure was not made, Trimark suggests that the award in favor of the Union and Mr. Naguib should be vacated. The Court disagrees.

Arbitration awards may be vacated where there is "evident partiality" on the part of the arbitrator. *See Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 147–50 (1968). A party asking the court to vacate an arbitration award "has a high burden of demonstrating objective facts inconsistent with impartiality." *Brown v. Brown-Thill*, 762 F.3d 814, 820 (8th Cir. 2014) (internal quotation marks omitted). Although it is unclear whether collective bargaining agreements are subject to the Federal Arbitration Act ("FAA"),[10] courts have considered the "evident partiality" standard under 9 U.S.C. § 10(a)(2) while analyzing labor arbitrations. *Williams v. Nat'l Football League*, 582 F.3d 863, 883 (8th Cir. 2009) (considering whether an arbitration award pursuant to a collective bargaining agreement should be vacated under the FAA).

"Evident partiality exists where the non-disclosure at issue objectively demonstrates such a degree of partiality that a reasonable person could assume that the arbitrator had improper motives." *Id.* at 885 (cleaned up). An arbitrator may exhibit evident partiality where

---

[10] *See Aldred v. Avis Rent-A-Car*, 247 Fed. App'x 167, 170 (11th Cir. 2007) (per curiam) ("Neither this Court nor the Supreme Court has decided whether collective bargaining agreements are subject to the FAA.").

he fails to disclose "a close business relationship with a party to the arbitration . . . warranting vacation of the arbitration decision, despite the absence of actual bias on the arbitrator's part." *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 51 F.3d 157, 159 (8th Cir. 1995) (discussing *Commonwealth Coatings Corp.*, 393 U.S. at 147–50). "[A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Commonwealth Coatings Corp.*, 393 U.S. at 150. The Supreme Court has stated that Congress, in passing the FAA, did not intend "to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another." *Id.*

In cases like this, where the parties have not agreed that they may select interested arbitrators, "[i]f an arbitrator was evidently partial, the district court may 'assume' prejudice where . . . the parties intended [the arbitrator] to be 'neutral.'" *Ploetz v. Morgan Stanley Smith Barney LLC*, 894 F.3d 894, 897 (8th Cir. 2018) (quoting *Delta Mine Holding Co. v. AFC Coal Props.*, 280 F.3d 815, 821–22 (8th Cir. 2001)). In *Ploetz*, the Eighth Circuit acknowledged a lack of precision in its own precedent in defining the "evident partiality" standard when a case involves an "undisclosed relationship . . . that is more tenuous" than the one involved in *Commonwealth Coatings Corp. Ploetz*, 894 F.3d at 898. However, the *Ploetz* court observed that "over time our interpretation of evident partiality has migrated in the salutary direction of its plain and ordinary meaning." *Id.* (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)). Ultimately, the *Ploetz* court held that an arbitrator's undisclosed work as a mediator in a prior case involving the defendant did not create "even an impression of possible bias" where the defendant paid a relatively small sum to the arbitrator in mediator

fees, which would not reasonably suggest the arbitrator was biased toward the defendant. *Id.* at 898-99.

Against this legal backdrop, the Court does not find that the arbitrator should have disclosed his prior role as a litigant in an employment discrimination lawsuit. The cases relied upon by Trimark simply do not support its position that the award in this case should be vacated for evident partiality. Those cases involve situations in which an arbitrator had an existing or past financial or professional relationship with a party. *Commonwealth Coatings Corp.*, 393 U.S. at 146 (explaining that the "supposedly neutral member of the panel" of arbitrators failed to disclose that he "conducted a large business in Puerto Rico, in which he served as an engineering consultant for various people in connection with building construction projects," and "[o]ne of his regular customers in this business was the prime contractor," a party to the arbitration); *Olson*, 51 F.3d at 159–60 (vacating arbitration award where one of the three arbitrators failed to disclose that he was a high-ranking official in a company that did a substantial business with an arbitration party).

By contrast, the alleged suggestion of bias in this case does not involve a connection between the arbitrator and either party to the arbitration. Rather, it arises from Mr. McCoy's personal involvement in a prior employment-discrimination lawsuit against a former employer. Trimark does not cite any case, and this Court's own research has not identified one, in which a court has vacated an arbitration award for a similar nondisclosure. In suggesting that such a failure to disclose creates disqualifying "evident partiality," Trimark essentially argues that because Mr. McCoy once believed he had a viable claim that he was wrongfully terminated by his own employer and sued that employer, he would be biased

against any employer accused of wrongfully discharging any employee. However, the facts do not reasonably suggest that he is forever predisposed in favor of any employee involved in a dispute against any employer. *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 306 (6th Cir. 1998) ("It is not enough to demonstrate an amorphous institutional predisposition toward the other side.").

Moreover, Trimark does not point to any aspect of Mr. McCoy's wrongful-discharge lawsuit that suggests a more particularized kind of predisposition in favor of the Union or Mr. Naguib. Of course, neither the Union, Mr. Naguib, nor Trimark had anything to do with that dispute. And it is worth noting that in Mr. McCoy's lawsuit against his former employer, he alleged that he was terminated in retaliation for having himself raised concerns about unlawful discrimination against others. *McCoy*, 2011 WL 3903282, at *3. The underlying dispute decided by Mr. McCoy in this case bears no resemblance to even the subject matter of that claim.

Trimark argues that the award should be vacated because it would have used its peremptory strike to exclude Mr. McCoy from the list of arbitrators if the fact of his involvement in the aforementioned litigation had been disclosed. Indeed, Trimark's counsel offers a declaration stating "[i]f this information had been disclosed in the Arbitrator's FMCS biographical information provided to the parties, I would have stricken him as an arbitrator from the list during the selection process with the Union's counsel." [Douglas Decl. ¶ 8]. Though that may be true, "the test for evident partiality does not turn on what the party seeking vacatur might have done with the undisclosed information (any new information might cause a party to strike an arbitrator), but on whether the undisclosed

relationship demonstrates that the arbitrator had evident partiality." *Ploetz*, 894 F.3d at 899. The undisputed evidence—that the arbitrator was a plaintiff in a case against his former employer more than a decade ago and did not disclose that fact to the parties—does not create even an impression of possible bias.

### E. Punitive Arbitration Award

Finally, Trimark argues that the arbitrator's decision and award are punitive because the remedy for Mr. Naguib did not offset his back pay by an amount equivalent to his earnings while he was unable to work at the Hotel.[11] Trimark suggests, without support, that "it is common for arbitrators to expressly offset any award of backpay by those amounts of interim wages and other earnings, including unemployment compensation, received by the grievant." [Pl.'s Mem. at 25–27]. Trimark does not cite a single case where a court has vacated an arbitration award because a backpay remedy did not include such an offset. To the extent Trimark argues that the remedy chosen by the arbitrator provides its own basis for vacating the award, its position is unpersuasive.

The parties have not cited, and this Court has not located, any Supreme Court or Eighth Circuit decision resolving whether an arbitrator may issue an award of backpay

---

[11] It is not clear from Trimark's briefing whether its position is that the allegedly punitive nature of the award in this case provides an independent basis for vacating the award. Rather, it appears Trimark contends that the arbitrator's refusal to offset the backpay remedy with interim earnings evinces the arbitrator's bias [Def.'s Mem. at 27]. Trimark further argues that "the point is the grievant secured alternative work following his separation from the employment, and it is those *interim earnings* that should have been credited. The arbitrator's refusal (not mere failure) to do so shows beyond doubt his lack of impartiality." [Def.'s Resp. & Reply at 11 ECF No. 29]. The Court finds no support for the argument that the arbitrator's choice of remedy demonstrates either the arbitrator's abandonment of the contractual language in favor of his own brand of justice or any bias against Trimark.

without offsetting or reducing those damages by a sum corresponding to a grievant's interim earnings. It is true that remedies in labor arbitrations are not entirely unreviewable, and some awards have been vacated where the record demonstrates that the arbitrator has issued a punitive award. *See, e.g.*, *Westinghouse Elec. Corp. v. Int'l Brotherhood of Elec. Workers*, 561 F.2d 521 (4th Cir. 1977) (affirming the district court's order vacating an arbitration award that gave employees additional paid vacation days that were not provided for in the collective bargaining agreement because the remedy was not compensatory, but punitive).[12] Nevertheless, the case law suggests that an arbitrator enjoys significant discretion in fashioning remedies. *Misco, Inc.*, 484 U.S. at 41 (providing that the arbitrator "is to bring his informed judgment to bear in order to reach a fair solution of a problem" and that this principle is "especially true when it comes to formulating remedies" (quoting *Enterprise Wheel*

---

[12] *Westinghouse Elec. Corp.* involved a disagreement over whether an employer had violated a term in a CBA that required the employer to negotiate with the union regarding the timing of vacation shutdowns in the following year. 561 F.2d at 522. The arbitrator found that the company violated the CBA by failing to give enough time for negotiations to take place before the deadline for announcing when vacation shutdowns would occur. *Id.* The arbitrator awarded each employee "three additional paid vacation days." *Id.* The district court found that the arbitrator ignored the language of the CBA "by viewing the shutdown itself, instead of just the time of the shutdown, as a matter for negotiation," but accepted the arbitrator's conclusion that the employer did not leave sufficient time for negotiations regarding the timing of the shutdown. *Id.* The court also concluded that the damages award of additional paid vacation "was impermissibly punitive" given that the union failed to prove any monetary loss. *Id.* at 522–23. The Fourth Circuit Court of Appeals affirmed, noting that prior arbitration rulings suggested remedies of additional paid vacation would be unjustified in the absence of evidence to justify a punitive sanction; that punitive damages should not be awarded if there is no willful or wanton conduct; and that the record neither contained evidence showing the employer acted willfully or wantonly, nor that any employee suffered any monetary loss that needed to be recompensed through additional paid vacation days. *Id.* at 523–24. The circumstances of *Westinghouse Elec. Corp.* provide no useful comparator for determining whether the arbitrator's award in this case was impermissibly punitive.

*& Car Corp.*, 363 U.S. at 597)); *Auto. Mechs. Local 701 v. Joe Mitchel Buick, Inc.*, 930 F.2d 576, 578 (7th Cir. 1991) ("It is settled that arbitrators have discretion to decide whether lost earnings should be offset by interim earnings or a failure to mitigate"). The Eighth Circuit has found that an arbitrator does not exceed his or her authority merely by fashioning a remedy that is not "expressly provided for in the agreement" because "contracts often lack explicit provisions for specific kinds of remedies." *Amalgamated Transit Union Local No. 1498 v. Jefferson Partners*, 229 F.3d 1198, 1201 (8th Cir. 2000).

The CBA in this case does not contain an explicit provision regarding backpay remedies in an arbitration, and Trimark points to no language in the CBA requiring the arbitrator to apply the offset to which it claims to be entitled.[13] The CBA states that the arbitrator's "ruling and decisions . . . shall be final and binding upon the parties." [CBA, Art. 4 § 7]. The arbitrator explicitly held that Trimark "shall not be allowed to deduct the amount of money the Grievant was able to secure during the period of his wrongful termination in calculating backpay due." [Arbitration Award at 22]. Trimark offers nothing other than its conclusory assertions to suggest the arbitrator's decision exceeded his authority or was

---

[13] The CBA includes an addendum regarding "Arbitration Procedures," which provides that the arbitration hearing is to be conducted under either the AAA Employment Law Rules or the JAMS Employment Arbitration Rules & Procedures for the Resolution of Employment Disputes. [CBA at 28]. AAA Employment Rule 39(d) provides that the arbitrator "may grant any remedy or relief that would have been available to the parties had the matter been heard in court." *AAA court- and time-tested rules and procedures*, American Arbitration Association, https://www.adr.org/Rules. JAMS Employment Rule 24(c) provides that the arbitrator "may grant any remedy or relief that is just and equitable and within the scope of the Parties' agreement, including but not limited to, specific performance of a contract or any other equitable or legal remedy." *JAMS Employment Arbitration Rules & Procedures*, JAMS, https://www.jamsadr.com/rules-employment-arbitration/english#Rule-24.

punitive.

Under these circumstances, the Court concludes that the absence of an offset or mitigation in the award provides no basis for the award to be vacated. *See James Monroe Condo. at Newport, Inc. v. Serv. Emp. Int'l Union Local 32BJ*, No. 20-cv-7455, 2021 WL 689148 (D.N.J. Feb. 23, 2021) (concluding that the employer did not show that the arbitrator's failure to consider mitigation evidence exceeded the arbitrator's power under 9 U.S.C. § 10(a)(4), and declining to vacate the arbitrator's award where the arbitrator retained jurisdiction to resolve any mitigation issues). Accordingly, Trimark's suggestion that the award is impermissibly punitive is rejected.

## III.    ORDER

For the reasons stated above, **IT IS HEREBY ORDERED THAT:**

1.  Plaintiff's Motion for Summary Judgment [ECF No. 16] is **DENIED**;

2.  Defendant's Motion for Summary Judgment [ECF No. 21] is **GRANTED**; and

3.  The Arbitration Award issued by Arbitrator A. Ray McCoy on January 11, 2021 is **CONFIRMED**.

**Let Judgment be entered accordingly.**

Date: March 23, 2022                              *s/ Katherine Menendez*
                                                 Katherine Menendez
                                                 United States District Judge

27